UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE HUNTINGTON NATIONAL BANK,
a national banking association,

        Plaintiff,

v.

SBAM PARK AVENUE, L.L.C., a Michigan
Limited liability company, JOHN R. GIBBS,
an individual, DIEGO REYES, an individual,
GABRIEL P. WEINERT, an individual,
MICHAEL OUAKNINE, an individual,
and THE MICHAEL OUAKNINE LIVING
TRUST DATED AUGUST 27, 2019,

        Defendants.

CASE NO. 2:23-cv-13000
HON. LAURIE J. MICHELSON
MAG. DAVID R. GRAND

---

## ANSWER TO VERIFIED COMPLAINT FOR FORECLOSURE, APPOINTMENT OF RECEIVER AND OTHER RELIEF, <u>AFFIRMATIVE DEFENSES AND COUNTERCLAIM</u>

Defendants SBAM Park Avenue, LLC, John R. Gibbs, Diego Reyes, Gabriel

P. Weinert, Michael Ouaknine, and The Michael Ouaknine Living Trust Dated

August 27, 2019, by their attorneys Williams, Williams, Rattner & Plunkett, P.C.,

for their Answer to Complaint state:

### <u>NATURE OF THE CASE</u>

1.    This action involves the default of Defendant SBAM Park Avenue,

L.L.C., as borrower, under the terms of a significant and sizeable commercial

1807584

construction loan in the amount of $23,429,000.00 (the "Loan") from Plaintiff, as lender.

**ANSWER:** Deny.

2.     This action is instituted to recover the amounts due and owing under the Loan, for recovery of amounts due under the guaranties at issue, for foreclosure of the real property given to secure the indebtedness under the Loan, and for the appointment of a receiver to prevent waste, prevent damage or destruction of the property, to operate and manage the property, collect rents and proceeds, and/or to sell the property at issue.

**ANSWER:** Deny.

## PARTIES, JURISDICTION AND VENUE

3.     Plaintiff incorporates by reference each of the foregoing allegations contained in this Complaint.

**ANSWER:** No response is necessary to this paragraph.

4.     Plaintiff is the successor by merger of TCF National Bank and is a national banking association with its main office as set forth in its articles of association in Columbus, Ohio.  Thus, Plaintiff is a citizen of Ohio for purposes of diversity jurisdiction under 28 U.S.C. §1332.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations.

1807584

5.      Defendant SBAM Park Avenue, L.L.C. is a Michigan limited liability company with its principal place of business in Michigan.  Defendant SBAM Park Avenue, L.L.C. is a citizen of Michigan for purposes of diversity jurisdiction under 28 U.S.C. §1332.

**ANSWER:**  The correct name of the entity is SBAM Park Avenue, LLC. Otherwise, Defendants admit the allegations.

6.      Upon information and belief, Defendant John R. Gibbs is an individual who resides in and maintains a Michigan address, and who operates a business in Michigan and is therefore domiciled in Michigan and is considered a citizen of Michigan for purposes of diversity jurisdiction under 28 U.S.C. §1332.

**ANSWER:**  Admit.

7.      Upon information and belief, Defendant Michael Ouaknine is an individual who resides in and maintains a Michigan address, and who operates a business in Michigan and is therefore domiciled in Michigan and is considered a citizen of Michigan for purposes of diversity jurisdiction under 28 U.S.C. §1332.

**ANSWER:**  Admit.

8.      Upon information and belief, Defendant The Michael Ouaknine Living Trust Dated August 27, 2019 is a trust formed and existing under the laws of the state of Michigan.  The situs of said Trust is in Michigan and its address, and who operates a business in Michigan and is therefore domiciled in Michigan and is

1807584

considered a citizen of Michigan for purposes of diversity jurisdiction under 28 U.S.C. §1332.

**ANSWER:** Admit.

9.      Upon information and belief, Defendant Diego Reyes is an individual who resides in and maintains a Greenwich, Connecticut address and is therefore domiciled in Connecticut and is considered a citizen of Connecticut for purposes of diversity jurisdiction under 28 U.S.C. §1332.

**ANSWER:** Admit.

10.     Upon information and belief, Defendant Gabriel P. Weinert is an individual who resides in and maintains a Los Angeles, California address and is therefore domiciled in California and is considered a citizen of California for purposes of diversity jurisdiction under 28 U.S.C. §1332.

**ANSWER:** Admit.

11.     Jurisdiction is also proper under because the amount in controversy exceeds $75,000.00 and Plaintiff otherwise seeks equitable relief including, without limitation, appointment of a receiver under Fed. R. Civ. P. 66 and federal law.

**ANSWER:** Defendants do not contest jurisdiction.

## GENERAL ALLEGATIONS

12.     Plaintiff incorporates by reference each of the foregoing allegations

1807584

contained in this Complaint.

**ANSWER:**  Defendants incorporate their answers to paragraphs 1 through 11 as if fully stated here.

13.     On July 20, 2021, Defendant SBAM Park Avenue, L.L.C., as borrower, (hereinafter, the "Borrower") executed a Term Loan Promissory Note with the Plaintiff in the original amount of $9,211,500.00 (the "original Note") (**Exhibit A**) along with a Term Loan Agreement (the "original Term Loan Agreement") (**Exhibit B**), designated as Loan No. xxxxxx3181, to secure funding for the purchase of the property known as 2305 Park Avenue, Detroit, Michigan 48201 (the "Property") and to finance the conversion of the Property from its then existing structure to a residential apartment complex with first floor retail space as set forth in the original loan documents.  The Original Note and Original Term Loan Agreement were amended by the Amendment to Term Loan Agreement and Term Loan Promissory Note (**Exhibit C**) and First Amendment Agreement (**Exhibit D**), both dated February 25, 2022.

**ANSWER:**  Defendants deny the allegations in this paragraph to the extent that the original amount of the Loan was for an amount "not to exceed $9,211,500.00."  Defendants admit the remaining allegations in the paragraph.

14.     On May 9, 2022, the Borrower executed a second Promissory Note with Plaintiff in the amount of $23,429,000.00 which converted and replaced the Original Note with a Construction and Term Note (the "Construction Note")

1807584

(**Exhibit E**), also designated as Loan No. xxxxxx3181(the "Construction Loan")
along with the Construction and Term Loan Agreement dated May 9, 2022 (the
"Construction Loan Agreement") (**Exhibit F**) to further finance the repurpose of
the Property as described herein and which is further referenced, defined and
referred to in the Construction Loan Agreement as the "Project."

**ANSWER:**  Defendants deny the allegations in this paragraph to the extent that the
Construction Note and the Construction Loan Agreement are for an
amount "not to exceed $23,429,000.00." Defendants admit the
remaining allegations in the paragraph.

15.    As collateral for the indebtedness due under the Construction Note,
Borrower granted Plaintiff a Construction Mortgage dated July 20, 2021, and
recorded on March 30, 2022 in Liber 57521, Page 81, Wayne County Records
(**Exhibit G**), as modified and amended by the Amended and Restated Construction
Mortgage dated May 9, 2022, as recorded on May 15, 2022 in Liber 57626, page
825, Wayne County Records (collectively, the "Construction Mortgage") (**Exhibit
H**), in which Plaintiff took a first secured interest in the Property.

**ANSWER:**  Admit.

16.    The indebtedness due under the Construction Loan is further secured
and evidenced by an Assignment of Leases and Rents granted by Borrower to
Plaintiff on July 20, 2021, and recorded on March 30, 2022 in Liber 57521, Page
114, Wayne County Records (**Exhibit I**), as modified by the Amended and
Restated Assignment of Leases and Rents dated May 9, 2022, as recorded on May

6

15, 2022 in Liber 57626, Page 858, Wayne County Records (collectively, the "Assignment of Rents") (**Exhibit J**).

**ANSWER:** Admit.

17.     The Construction Loan is further secured by Plaintiff's perfected filings of all-asset blanket lien UCC Financing statements with the Michigan Department of State, recorded on March 2, 2022, as Filing Number 20220302000513-0 (**Exhibit K**) and on March 22, 2022, as Filing Number 20220322000200-3 (**Exhibit L**) (collectively, the "UCC Financing Statements").

**ANSWER:**   Defendants admit that the referenced UCC Financing statements appear to have been recorded and that they are attached to the Complaint as Exhibit K and Exhibit L.  Defendants deny the remaining allegations.

18.     Payment of the Construction Loan is guaranteed by the Michael Ouaknine Living Trust Dated August 27, 20191, John R. Gibbs, individually, Michael Ouaknine, individually, Diego Reyes, individually, and Gabriel P. Weinert, individually (each a "Guarantor" and collectively, the "Guarantors"), each promising the full and prompt repayment of the Construction Loan according to the expressed terms set forth in the Guaranty of Payment executed by the Guarantors on July 20, 2021 (**Exhibit M**), and May 9, 2022 (**Exhibit N**) and the Reaffirmation of Guarantors dated February 25, 2022 (**Exhibit O**) (collectively, the "Guaranty of Payment").

**ANSWER:**  Plaintiff references and attaches to the Complaint Guarantys of Payment and a Reaffirmation of Guarantors.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of those agreements.

19.     Together, the Original Note, the Original Term Loan Agreement, the Construction Note, the Construction Loan Agreement, the Construction Mortgage, the Assignment of Rents, the UCC Financing Statements, and the Guaranty of Payment shall collectively be referred to herein as the "Loan Documents" and the amounts due under the Loan Documents shall be referred to herein as the "Indebtedness".

**ANSWER:**  No response is necessary to the allegations in this paragraph since they are not statements of fact.  To the extent that an answer is necessary, Defendants deny the allegations.  Defendants also adopt by reference the description of the "Loan Documents" as referenced in this paragraph.

20.     Section 6 of the Construction Loan Agreement sets forth specific "Project Covenants" for the construction of the Project **(Exhibit F, pages 42-45)**.

**ANSWER:**  Admit.

21.     Paragraph 6.1 of the Construction Loan Agreement entitled "Completion of Project" requires that the "Borrower will commence construction of the Project on or prior to the Construction Commencement Date and will cause construction to continue without interruption until completion…" **(Exhibit F, page 42).**

1807584

**ANSWER:** The allegations in this paragraph contain references to the Construction Loan Agreement.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of that Agreement.

22.     Under Section 1 of the Construction Loan Agreement, "Definitions and Interpretation", the "Construction Commencement Date" is defined as "the date that construction of the Project commences, which shall be on or before the date that is sixty (60) days after the Loan Closing Date." **(Exhibit F, Page 3)**.

**ANSWER:** The allegations in this paragraph contain references to the Construction Loan Agreement.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of that Agreement.

23.     The Loan Closing Date is defined as "the date upon which the Closing occurs." **(Exhibit F, Page 8)**.

**ANSWER:** The allegations in this paragraph contain references to the Construction Loan Agreement.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of that Agreement.

24.     The Loan Closing occurred on May 9, 2022, and therefore construction of the Project is required to and should have commenced on or before July 9, 2022. *Id.*

**ANSWER:** Deny.  60 days from May 9, 2022 is July 8, 2022.  Further, Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Construction Loan Agreement.

25.     To date, construction of the Project has not occurred, and the Borrower is still in the infancy process of bidding and finalizing the selection of a general contractor.

1807584

**ANSWER:** Deny.

26.     The Borrower's failure to comply with Project Covenant 6.1 that requires construction of the Project to commence on or before July 9, 2022, constitutes an "Event of Default" under paragraph 11.1(b) of the Construction Loan Agreement. **(Exhibit F, Pages 62-63)**.

**ANSWER:** Deny.

27.     Time is of the essence as to all covenants of the Loan Documents as stated in Paragraph 14.16 of the Construction Loan Agreement, including, but not limited to, the time sensitive Project Covenant 6.1. **(Exhibit F, Page 72)**.

**ANSWER:** Defendants admit that section 14.16 of the Construction Loan Agreement reads "Time is of the essence of all the Loan Documents." Defendants deny the remaining allegations in the paragraph.

28.     On December 22, 2022, Plaintiff sent Defendants a notice of default and demand for payment (**Exhibit P, Notice of Default Letter).**

**ANSWER:** Defendants admit that Plaintiff sent Defendants a letter dated December 22, 2022 and that the letter is attached at Exhibit P to the Complaint.  Defendants deny that they were in default.

29.     Thereafter, the parties initiated communications and held meetings with counsel present to try and resolve the matter amicably, but to no avail.

**ANSWER:** Admit.

30.     Despite the notice of default and demand for payment, and the attempt at an amicable resolution to avoid litigation, the Borrower has failed and refuses to

1807584

pay the Indebtedness owed under the Construction Loan and to date remains in Default.

**ANSWER:** Deny.

31.     Defendants currently owe Plaintiff the following outstanding balance of the Loan, inclusive of interest and late fees through November 27, 2023, plus all accruing but unpaid interest, late fees, other disbursements, penalties, protective advances, and other lawful charges under the Loan Documents after said date and through the date of judgment, exclusive of all attorney fees and costs (referred to and defined hereafter as the ("Loan Balance").

| | |
|---|---|
| Principal: | $9,527,602.90 |
| Interest: | $1,084,059.94 |
| Late Charges: | $57,276.21 |
| **Loan Balance:** | **$10,668,939.05** |

**ANSWER:** Deny.

32.     Borrowers are also contractually liable for payment of Plaintiff's attorney fees and costs incurred by Plaintiff by virtue of default and acceleration of the Indebtedness and for Plaintiff's enforcement of the Loan Documents.

**ANSWER:** Deny.

33.     Pursuant to the Loan Documents including, without limitation, at section 11.2(c) of the Construction Loan Agreement (**Exhibit F**) and at section 20 of the Construction Mortgage (**Exhibit H**), the Borrower explicitly agreed and

1807584

consented to the appointment of a receiver over the Property upon the occurrence

and during the continuance of a default under the Loan Documents.

**ANSWER:**   The allegations in this paragraph contain references to the Loan
Documents.  Defendants deny any allegations in the paragraph that
are inconsistent with the terms of the Loan Documents.

34.   The appointment of a receiver over the Property in this case is

necessary to prevent waste, loss, transfer, dissipation, or impairment as the

Borrower remains in default under the Loan Documents.

**ANSWER:**  Deny.

35.   In addition, and due to Borrower's conduct, the collateral held by the

Construction Mortgage may not be sufficient to satisfy the secured obligation due.

**ANSWER:**  Deny.

36.   Moreover, and upon information and belief, there is a great likelihood

that the Borrowers may conceal and improperly retain rents and profits and/or

otherwise impair, dissipate, and damage the Property unless a receiver is able to

immediately take over the Property and business operations.

**ANSWER:**  Deny.

37.   This Court should appoint a receiver pursuant to Fed. R. Civ. P. 66

and applicable law to allow Plaintiff to realize upon its commercial collateral and

be made whole.

**ANSWER:**  Deny.

1807584

## COUNT I – ALLEGED BREACH OF COMMERCIAL NOTE

38.     Plaintiff incorporates by reference each of the foregoing allegations contained in this Complaint.

**ANSWER:** Defendants incorporate their answers to paragraphs 1 through 37 as if fully stated here.

39.     By executing and delivering the Construction Note to Plaintiff in exchange for the loan proceeds, the Borrower entered into a valid and binding contract, thereby obligating itself to honor the terms of the Construction Note (**Exhibit E**).

**ANSWER:** Admit.

40.     The Construction Note, at section 5, states that the occurrence of any "Event of Default" under the Construction Loan Agreement, would also constitute an event of default under the Construction Note.

**ANSWER:** The allegations in this paragraph contain references to the Construction Note.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Construction Note.

41.     Borrower is in default of the terms of the Construction Loan Agreement for failure to comply with section 6.1 of the Construction Loan Agreement entitled "Completion of Project" which requires that the "Borrower will commence construction of the Project on or prior to the Construction Commencement Date.

**ANSWER:** Deny.

42.    Time is of the essence as to requirement to commence construction of the Project on or before the Construction Commencement Date.

**ANSWER:**    Plaintiff appears to be paraphrasing language from the Loan Documents in this paragraph.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Loan Documents.

43.    Despite notice and opportunity to cure, the Borrower has neglected and/or refused to pay the Indebtedness due under the Construction Note to Plaintiff.

**ANSWER**:  Deny.

44.    As a result of the Borrower's failure to comply with its obligations under the Loan Documents, Plaintiff has suffered and will continue to suffer damages due to the Borrower's defaults.

**ANSWER**:  Deny.

45.    Should this Court appoint a receiver over the Property, and to the extent any receivership sale does not generate proceeds sufficient to pay off the entire Indebtedness due under the Loan Documents, Plaintiff will continue to suffer damages.

**ANSWER**:  Deny.

46.    Under the terms of the Construction Note, Plaintiff is entitled to a judgment against the Borrowers for any deficiency amount remaining, including all

14

1807584

attorney fees and costs, following any disposition of the Property by any receiver

appointed by this Court.

**ANSWER**:  Deny.

## COUNT II – ALLEGED BREACH OF GUARANTY

47.    Plaintiff incorporates by reference each of the foregoing allegations

contained in this Complaint.

**ANSWER:**  Defendants incorporate their answers to paragraphs 1 through 46 as if
fully stated here.

48.    The Guaranty of Payment executed by the Michael Ouaknine Living

Trust Dated August 27, 2019, John R. Gibbs, individually, Michael Ouaknine,

individually, Diego Reyes, individually, and Gabriel P. Weinert, individually, is

a valid and enforceable contract (**Exhibits M, N and O**).

**ANSWER**:  Deny.  Plaintiff's prior material breach of the terms of the Loan
Documents has excused Defendants performance under the Loan
Documents.  Defendants have never been in default in any instance.

49.    Under the Guaranty of Payment, each of the Guarantors

unconditionally and irrevocably promised to pay the Indebtedness due by the

Borrower under the Construction Note in the event of a default thereunder.

**ANSWER:**  The allegations in this paragraph contain references to the Guaranty of
Payment.  Defendants deny any allegations in the paragraph that are
inconsistent with the terms of the Guaranty of Payment.

50.    After noticing to the Borrower of its default and demand for payment

1807584

by Plaintiff, the Guarantors have neglected and/or refused to pay the Indebtedness due.

**ANSWER**:  Deny.

51.    Guarantors' failure to pay constitutes a breach of the Guaranty of Payment.

**ANSWER**:  Deny.

52.    Plaintiff has suffered damages because of the Guarantors' failure to honor the terms of the Guaranty of Payment.

**ANSWER**:  Deny.

**COUNT III – ALLEGED BREACH OF THE ASSIGNMENT OF RENTS**

53.    Plaintiff incorporates by reference each of the foregoing allegations contained in this Complaint.

**ANSWER:**  Defendants incorporate their answers to paragraphs 1 through 52 as if fully stated here.

54.    The Assignment of Rents executed by the Borrower is a valid and enforceable contract (**Exhibit J**).

**ANSWER:**  Deny.  Plaintiff's prior material breach of the Loan Documents excuses any performance by Defendants under the Loan Documents. Defendants have never been in default in any instance.

55.    Pursuant to the Assignment of Rents, Plaintiff has an unconditional and absolute right and interest in and to all rents and proceeds from the Property.

**ANSWER**:  Deny.

1807584

56.     Any occurrence of an "Event of Default" by the Borrower under the Construction Loan Agreement (**Exhibit J, ¶ 1**) or under any of the other Loan Documents (**Exhibit J, ¶ 7**) constitutes a default under the Assignment of Rents which immediately suspends the Borrowers' right to collect such rents and proceeds. (**Exhibit J, ¶ 8**).

**<u>ANSWER</u>:** The allegations in this paragraph contain references to the Loan Documents.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Loan Documents.

57.     Upon any default under the Assignment of Rents, the right to collect such rents and proceeds inures to the Plaintiff who, by way of receiver or otherwise, may collect such rents and proceeds as allowed thereunder.

**<u>ANSWER</u>:** The allegations in this paragraph contain references to the Assignment of Rents.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Assignment of Rents.

58.     The Borrower remains in default under the Loan Documents and has failed and refused to turn over any such rents and proceeds and/or the ability to generate such rents and profits to the Plaintiff.

**<u>ANSWER</u>**:  Deny.

59.     Plaintiff has suffered damages as result of Borrower's breach of the Assignment of Rents.

**<u>ANSWER</u>**:  Deny.

1807584

## COUNT IV – ALLEGED FORECLOSURE UPON MORTGAGE

60.     Plaintiff incorporates by reference each of the foregoing allegations contained in this Complaint.

**ANSWER:** Defendants incorporate their answers to paragraphs 1 through 59 as if fully stated here.

61.     The Borrower is in default under the terms of the Loan Documents including particularly the Construction Note, the Construction Loan Agreement, and the Construction Mortgage.

**ANSWER:** Deny.

62.     Plaintiff has provided appropriate notice to Defendants of their defaults.

**ANSWER:** Deny.  Defendants deny that they are in default so any "notice" is not appropriate.

63.     Despite such notices, Defendants have failed, refused or neglected to cure such defaults or to make payment as required under the terms of the Loan Documents.

**ANSWER:** Deny.

64.     Under the Loan Documents, such defaults entitle Plaintiff to exercise all remedies under the Loan Documents and applicable law. Such remedies include, without limitation, the option to commence proceedings to foreclose the Construction Mortgage.

1807584

**ANSWER:**  Deny.

65.     There are no current proceedings to recover all or part of the debt

secured by the Construction Mortgage, or any part of it, and no part of the debt

currently due and owing has been collected or paid.

**ANSWER:**  Deny.

66.     Based upon a search of title, Plaintiff has joined as Defendants to this

suit all those persons and entities whose interests appear of record or whose

interests Plaintiff is otherwise aware of and whose interests will be extinguished or

otherwise adversely affected by foreclosure of the Construction Mortgage in this

count.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief
            about the truth of the allegations.

67.     The total amount the Borrower owes under the Note is

**$10,668,939.05,** inclusive of interest and late fees through November 27, 2023.

The Borrower is liable for the immediate payment of this amount, together with

interest which continues to accrue thereon, plus attorney fees, costs and expenses

incurred and to be incurred by Plaintiff in collection thereof.

**ANSWER:**  Deny.

### COUNT V – APPOINTMENT OF RECEIVER

68.     Plaintiff incorporates by reference each of the foregoing allegations

contained in this Complaint.

1807584

**ANSWER:** Defendants incorporate their answers to paragraphs 1 through 67 as if fully stated here.

69.     Section 20 of the Construction Mortgage (**Exhibit H**) provides:

20. <u>Appointment of Receiver</u>. Upon or at any time after the filing of a complaint to foreclose this Mortgage, the court in which such complaint is filed shall, upon petition by the Lender, appoint a receiver for the Mortgaged Property, and Borrower hereby consents to such appointment. Such appointment may be made either before or after sale, without notice, without regard to the solvency or insolvency of the Borrower at the time of application for such receiver and without regard to the value of the Mortgaged Property or whether the same shall be then occupied as a homestead or not and the Lender hereunder or any other holder of the Note may be appointed as such receiver. Such receiver shall have power to collect the rents, issues and profits of the Mortgaged Property (i) during the pendency of such foreclosure suit, (ii) in case of a sale and a deficiency, during the full statutory period of redemption, whether there be redemption or not, and (iii) during any further times when the Borrower, but for the intervention of such receiver, would be entitled to collect such rents, issues and profits. Such receiver also shall have all other powers and rights that may be necessary or are usual in such cases for the protection, possession, control, management and operation of the Mortgaged Property during said period, including, to the extent permitted by law, the right to lease all or any portion of the Mortgaged Property for a term that extends beyond the time of such receiver's possession without obtaining prior court approval of such lease. The court from time to time may authorize the application of the net income received by the receiver in payment of (a) the Indebtedness, or by any decree foreclosing this Mortgage, or any tax, special assessment or other lien which may be or become superior to the lien hereof or of such decree, provided such application is made prior to foreclosure sale, and (b) any deficiency upon a sale and deficiency.

**ANSWER:** Defendants admit that it appears that the cited language appears in the Construction Mortgage.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Construction Mortgage.

1807584

70.    As described herein, the Borrower has defaulted under the Loan Documents by failing to commence construction of the Project as and when required.

**ANSWER:** Deny.

71.    Time is of the essence as to this time sensitive commence of construction date.

**ANSWER:** Deny.

72.    Pursuant to section 20 of the Construction Mortgage, the Borrower contractually agreed and consented to the appointment of a receiver upon or at any time after filing of a complaint for foreclosure. (**Exhibit H, ¶ 20**).

**ANSWER:** The allegations is this paragraph contain references to the Construction Mortgage. Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Construction Mortgage.

73.    Plaintiff is further entitled to the appointment of a receiver over the Property under the terms of the Assignment of Rents. Upon any default under the Assignment of Rents, the right to collect such rents and proceeds inures to the Plaintiff who, by way of receiver or otherwise, may collect such rents and proceeds as allowed thereunder. (**Exhibit J**).

**ANSWER:** Deny.

74.    Plaintiff will suffer irrevocable loss and irreparable harm by substantial deterioration in the value of its collateral unless a receiver is appointed

21

to manage, operate, maintain, control, and protect the Property, to collect rents and proceeds, and to cause payment of necessary expenses such as utilities, taxes and insurance, maintenance, and generally to preserve and protect the Property and Plaintiff's mortgage interest thereon.

**ANSWER:** Deny.

75.    All parties having an interest in the Property will suffer irreparable loss unless a receiver is appointed to manage, control and ultimately sell the Property, in lieu of a foreclosure sale, and apply the proceeds of any such sale to pay any and all valid expenses, liens and interests thereon.

**ANSWER:** Deny.

76.    This Court may appoint a receiver under Fed. R. Civ. P. 66 and applicable law.

**ANSWER:** No answer is necessary to this paragraph since it merely states a legal conclusion.  To the extent an answer is required, Defendants deny the allegations.

### COUNT VI - ATTORNEY FEES AND COSTS

77.    Plaintiff incorporates by reference each of the foregoing allegations contained in this Complaint.

**ANSWER:** Defendants incorporate their answers to paragraphs 1 through 76 as if fully stated here.

78.    Section 6 of the Construction Note (**Exhibit E**) clearly states that if

any suit or action is instituted by Plaintiff or if attorneys are retained to collect on the Construction Note, the Borrower contractually promises and agrees to pay all out of pocket costs of collection including reasonable attorneys' fees and court costs.

**ANSWER:**  The allegations in this paragraph contain references to the Construction Note.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Construction Note.

79.     In addition, pursuant to section 31(a) of the Construction Mortgage (**Exhibit H**) the Borrower also promised and agreed to pay Plaintiff all reasonable attorneys' fees associated with the enforcement of the Note, the Construction Mortgage or other Loan Documents.

**ANSWER:**  The allegations in this paragraph contain references to the Construction Mortgage.  Defendants deny any allegations in the paragraph that are inconsistent with the terms of the Construction Mortgage.

80.     Both the Construction Note and the Construction Mortgage are valid and binding contracts between the Parties.

**ANSWER:**  Deny.  Plaintiff's prior material breach of the Loan Documents have excused Defendants' performance under those contracts.  Defendants have never been in default in any instance.

81.     As a result of the Borrower's defaults as described herein, Plaintiff has commenced these proceedings to collect upon the Indebtedness due under the Construction Note and has incurred damages in the form of attorneys' fees and costs.

1807584

**ANSWER:** Deny.

82. The Borrower is contractually liable for Plaintiff's out of pocket collection costs including reasonable attorneys' fees and court costs.

**ANSWER:** Deny.

## REQUEST FOR RELIEF

Defendants respectfully request that the Court provide them with the following relief:

a. dismiss with prejudice all of the claims in Plaintiff's Complaint;

b. deny all of Plaintiff's claims for relief;

c. deny Plaintiff's claims for attorneys' fees;

d. deny Plaintiff's request for the appointment of a receiver; and

e. provide Defendants with all other relief that the Court believes is appropriate.

> WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
> */s/Wayne Walker*
> By: Richard E. Rassel, III (P57540)
> Wayne Walker (P51290)
> Attorneys for Defendants
> 380 N. Old Woodward Ave., Ste. 300
> Birmingham, MI 48009
> (248) 642-0333

Dated: January 10, 2024     rer@wwrplaw.com; wew@wwrplaw.com

1807584

## **AFFIRMATIVE DEFENSES**

Defendants SBAM Park Avenue, LLC, John R. Gibbs, Diego Reyes, Gabriel P. Weinert, Michael Ouaknine, and The Michael Ouaknine Living Trust Dated August 27, 2019, by their attorneys Williams, Williams, Rattner & Plunkett, P.C., for the defenses that they may or will rely upon at the time of trial state:

1.      Plaintiff's prior material breach(es) of contract has/have excused Defendants' performance under the applicable contracts.

2.      Plaintiff has breached the implied covenant and duty of good faith and fair dealing in the performance of its contractual obligations and it has in bad faith attempted to destroy Defendants' right to receive the benefits of the parties' agreements, barring Plaintiff's claims.

3.      Plaintiff's claims are barred in whole or in part due to waiver and/or estoppel.

4.      Plaintiff's claims are barred by laches.

5.      Plaintiff has unclean hands.

6.      Plaintiff has failed to state a claim upon which relief may be granted.

7.      Plaintiff has failed to mitigate its alleged damages.

8.      Due to Plaintiff's actions, Defendants performance under the applicable contracts has become impossible or impractical.

1807584

WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
*/s/Wayne Walker*

By:   Richard E. Rassel, III (P57540)
Wayne Walker (P51290)
Attorneys for Defendants
380 N. Old Woodward Ave., Ste. 300
Birmingham, MI  48009
(248) 642-0333

Dated:  January 10, 2024    rer@wwrplaw.com; wew@wwrplaw.com

## SBAM PARK AVENUE, LLC'S COUNTERCLAIM

Defendant/Counter-Plaintiff SBAM Park Avenue, LLC ("SBAM"), by its

attorneys Williams, Williams, Rattner & Plunkett, P.C., for its Counterclaim

against Plaintiff/Counter-Defendant Huntington National Bank ("Huntington")

states:

### PARTIES, JURISDICTION AND VENUE

1.    Huntington represents in its Complaint (ECF No. 1, PAGEID.2.) that

it is the successor by merger of TCF National Bank and that it is a national banking

association with its main office as set forth in its articles of association in

Columbus, Ohio.

2.    SBAM is a Michigan limited liability company with its principal place

of business in Michigan.

1807584

3.      Jurisdiction is proper under 28 U.S.C. §1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00.

4.      Venue is proper in this Court under 28 U.S.C. §1391(b)(2) since a substantial part of the events or omissions giving rise to this action occurred in this district, and a substantial part of the property that is a subject of the action is situated in this district.

## GENERAL ALLEGATIONS

5.      SBAM was formed to purchase and develop the real property known as 2305 Park Avenue, Detroit, Michigan for residential development purposes, including the planned conversion of the real property from its then existing structure to a residential apartment complex with first floor retail space (the "Project").

6.      The Project sits in the District Detroit area, an important development and re-development zone for the City of Detroit, Wayne County and the entire State of Michigan and surrounding regions.

7.      Huntington agreed to finance the Project (a for profit enterprise) both for acquisition and re-development purposes (construction financing).  Huntington underwrote the Project financing after successfully completing its due diligence to its satisfaction.

1807584

8.      SBAM's principal equity investors 2305 Park Avenue GP LLC and Park Ave Investor, LLC have invested nearly $7,000,000.00 in combined equity in the Project (the "Equity") of which Huntington is fully aware.

9.      SBAM's Project proforma projects a total development profit to its investors of approximately $10,500,00.00 (the "Projected Profit"), a projection that Huntington accepted and agreed to in underwriting and financing the Project.

10.      Accordingly, SBAM, as borrower, executed a Term Loan Promissory Note with Huntington in the original amount not to exceed $9,211,500.00 (the "Original Note") (See Complaint Exhibit A, ECF No. 1-2, PAGEID.26-37.) along with a Term Loan Agreement (the "Original Term Loan Agreement") (See Complaint Exhibit B, ECF No. 1-3, PAGEID.38-107.) to secure funding for the purchase of the Project.

11.      On May 9, 2022, SBAM executed a second Promissory Note with Huntington in the amount of $23,429,000.00 which converted and replaced the Original Note with a Construction and Term Note (the "Construction Note") (See Complaint Exhibit E, ECF No. 1-6, PAGEID.131-145.) (the "Construction Loan") along with the Construction and Term Loan Agreement dated May 9, 2022 (the "CLA") (See Complaint Exhibit F, ECF No. 1-7, PAGEID.146-255.) in order to further finance the Project and the intended redevelopment and construction activities.

1807584

12.     Under the CLA, Huntington has a specific obligation, pursuant to Section 2.1 of the CLA, to fully fund the Project, as: ". . . Lender agrees to lend to Borrower, an amount not to exceed the Loan Amount, on the terms of and subject to the conditions of this Agreement."  (See Complaint Exhibit F, ECF No. 1-7, PAGEID.169.)

13.     Under the CLA, the Loan Amount is $23,429,000.00.

14.     Section 6 of the CLA sets forth specific "Project Covenants" for the construction of the Project.

15.     Under Section 6.1 of the CLA entitled "Completion of Project" (subject to Section 3.1 of the CLA – discussed below), the "Borrower will commence construction of the Project on or prior to the Construction Commencement Date and will cause construction to continue without interruption until completion…". (See Complaint Exhibit F, ECF No. 1-7, PAGEID.196.)

16.     The phrase "commence construction" is not defined in the CLA or in any of the other loan documents in the transaction or relevant to the Project.

17.     Under Section 1 of the CLA, "Definitions and Interpretation", the "Construction Commencement Date" (subject to Section 3.1 of the CLA – discussed below) is defined as "the date that construction of the Project commences, which shall be on or before the date that is sixty (60) days after the Loan Closing Date." (See Complaint Exhibit F, ECF No. 1-7, PAGEID.157.)

29

18.     The "Loan Closing Date" is defined as "the date upon which the Closing occurs." (See Complaint Exhibit F, ECF No. 1-7, PAGEID.162.)

19.     The loan closing occurred on May 9, 2022, and therefore construction of the Project by SBAM was required to commence on or before July 8, 2022 (but subject to Section 3.1 of the CLA – discussed below).

20.     The Final Construction Completion Date means the date that is 30 months after the Loan Closing Date which is November 9, 2024 (but subject to Section 3.1 of the CLA – discussed below). (See Complaint Exhibit F, ECF No. 1-7, PAGEID.159.)

21.     SBAM timely commenced construction of the Project within the meaning intended by the parties and in accord with industry standard by at least May 13, 2022 through various construction related activities as SBAM specifically advised Huntington in its default notice letter to Huntington dated February 28, 2023 attached here at **Exhibit 1**. ("The Borrower has engaged in various construction activities for the Project of which Lender is fully aware, several of which occurred prior to the Construction Commencement Date, including but not limited to: (i) the payment of municipal fees; (ii) obtaining a demolition permit; (iii) performing demolition and site safety work activities; (iv) completing architectural and engineering work with Kraemer Design Group and others at the expense of hundreds of thousands of dollars of Borrower's investor equity; (v)

engaging Monahan Construction as the Project general contractor; (vi) pursuing and investing in obtaining certain historic tax credits for the Project; (vii) building infrastructure and mounting signage assets on the building; (viii) and performing certain other abatement and demolition preparation work on the project.") **Exhibit 1, pp. 2-3**.

22.     SBAM representatives Michael Ouaknine, Diego Reyes and Gabriel Weinert had several discussions with Huntington's Senior Vice President Adam Luderer in May, 2022, after the CLA closing, in which Luderer and Huntington agreed that by securing the demolition permit alone in May, 2022, SBAM had "commence(d) construction" under the CLA and that the Project was in full compliance with the projected 30 month Final Construction Completion Date under the CLA (the actual Project construction schedule was projected to be only 15-16 months in total).

23.     On November 28, 2022, Ouaknine and SBAM representative John Gibbs attended a meeting with Huntington representatives.  The subject of the meeting was alleged concern regarding two residential developments in Detroit known as the "Sheridan" and "Wellesley" projects for which Huntington is the lender.

31

24.     SBAM and the Project are not related to the Sheridan and Wellesley projects by any agreement with Huntington (no cross-default agreements, no cross-collateral agreements, etc.).

25.     On December 2, 2022 Huntington Vice President Wayne Janette emailed SBAM regarding concern over Sheridan and Wellesley.  Janette for the first time co-mingled the "current status" of the Project and SBAM with the Sheridan and Wellesley Huntington loans, citing a recent changing interest rate environment for real estate projects.

26.     At a December 8, 2022 meeting with Ouaknine, Janette again co-mingled the status of the Project and SBAM with the Huntington Sheridan and Wellesley loans.

27.     Throughout the approximate time frame from November 15, 2022 through December 15, 2022, Reyes, Weinert and Ouaknine kept Luderer informed about the progress of the Project.

28.     On or about December 6, 2022, Weinert spoke with Luderer regarding the Project.  Luderer confirmed to Weinert that there was no default with SBAM or the Project under the CLA, and Luderer encouraged Weinert and SBAM to keep working on the Project in the ordinary course.

29.     However, in a separate phone conference during this period, Luderer informed Reyes, in a communication Luderer said was intended to be off the

record, that the Project would be best served if certain individuals affiliated with

SBAM, who were also affiliated with Sheridan and Wellesley, be removed from

the SBAM Project.  If not, Huntington could or would find reasons to determine

that SBAM was in default under the CLA.

30.     In the same call, Luderer confirmed that since SBAM was still well

able to meet the 30-month Final Construction Completion Date (November 9, 2024

or after per Section 3.1 of the CLA), SBAM was not in default concerning the

commencement of construction.

31.     Later, sometime prior to December 15, 2022, Luderer again informed

Reyes that although SBAM was not in default under the CLA, Huntington was

considering declaring SBAM in default with respect to the Project if Huntington

did not get what it was demanding on Sheridan and Wellesley.

32.     On December 22, 2022, Huntington sent Defendants a notice of

default and immediate demand for full repayment of the Loan Amount under the

CLA. (See Complaint, Exhibit P, ECF No. 1-17, PAGEID.396-405.) ("Huntington

Notice" or "Notice").

33.     In the Notice, Huntington declared that SBAM was in default solely

because construction on the Project had not commenced on or before July 8, 2022,

under Huntington's purported interpretation of the CLA.  Huntington took the

1807584

position that as of December 22, 2022, construction had yet to commence. (See Complaint, Exhibit P, ECF No. 1-17, PAGEID.396-405.)

34.     The Notice was the first notice that Huntington had provided to SBAM in which Huntington expressed any dissatisfaction with the progress of the Project.

35.     Huntington did not give SBAM the opportunity to cure the alleged default as required by the CLA at Section 11.1(b) (See Complaint Exhibit F, ECF No. 1-7, PAGEID.217.) and it unequivocally and immediately terminated its contractual obligation to fund the Project under the CLA and Section 2.1.

36.     Huntington has since refused to make any further advances of loan proceeds under the CLA, and it declared in the Huntington Notice that the outstanding principal balance of the Loan Amount (including interest and other charges) to be immediately due and payable in full. (See Complaint, Exhibit P, ECF No. 1-17, PAGEID.396-405.)

37.     In the Notice, Huntington asserted that the amount owing on the Construction Loan was $9,541,564.30. (See Complaint, Exhibit P, ECF No. 1-17, PAGEID.400.)

38.     In the Notice, Huntington unequivocally declared "there will be no further funding of the Construction Loan." (See Complaint, Exhibit P, ECF No. 1-17, PAGEID.400.)

1807584

39.     In the Notice, Huntington also declared that it would use the present balance of $365,792.10 in the pre-allocated interest reserve to pay accrued interest on the Construction Loan. (See Complaint, Exhibit P, ECF No. 1-17, PAGEID.400.)

40.     On January 5, 2023, Luderer sent an email to SBAM in which he wrote among other things "they still want to do the Park Avenue deal."  Luderer said that Huntington wanted a new appraisal in conjunction with underwriting a new deal.

41.     On or about January 7, 2023, Reyes spoke with Luderer about the situation as Luderer had referred to in his previous email.

42.     Luderer informed Reyes that it was unlikely that SBAM could obtain any relief from Huntington due to the Sheridan and Wellesley deals and that Huntington was effectively shutting down its financing for and role in the Project, and demanding immediate repayment of all amounts due under the CLA.

43.     Luderer also said that: a) the only reason that the SBAM loan was put into default was because of Sheridan and Wellesley; and b) Jannette and Huntington's Financial Recovery Group would be taking over the loan relationship with SBAM.

44.     On January 13, 2023, a conference call occurred among SBAM and Huntington.  Jannette informed SBAM that Luderer was no longer involved.

35

Huntington's primary concern during the conference call was the alleged defaults of Sheridan and Wellesley, not SBAM or the Project.

45.     Thus, it became clear that Huntington had put the full financial squeeze on SBAM and the Project for reasons unrelated to the CLA or the Project (or any pretextual alleged default by SBAM).  Huntington acted in bad faith exclusively based on Huntington's internal concerns over the unrelated Sheridan and Wellesley projects and its accompanying desire to exit its obligations to SBAM and the Project.

46.     On February 28, 2023, SBAM and the other Defendants, through counsel, responded to the Huntington Notice with a default notice of its own. (the "SBAM Notice"). **Exhibit 1**.

47.     In the SBAM Notice, the Defendants denied that they are in default of any terms of the CLA, including the commencement of construction date or any risk to the 30-month Final Construction Completion Date.  Defendants asserted that Huntington had materially breached the CLA by its refusal to fund the Loan among other things (Section 2.1. ". . . Lender agrees to lend to Borrower, an amount not to exceed the Loan Amount, on the terms of and subject to the conditions of this Agreement."). **Exhibit 1, p. 2**.

48.     As noted above, SBAM continuously advised Huntington and Luderer of the progress of its construction activities at all times.  Critically, Huntington and

Luderer continuously advised SBAM that its activities constituted the timely commencement of construction (meaning "commence construction" under Section 6.1).

49.     Even if certain of the construction related activities described above, or others, occurred near or after the Construction Commencement Date, they occurred prior to the issuance of the Huntington Notice.

50.     By engaging in those construction activities, and continuously advising Huntington and its representative of the occurrence of such construction activities, to Huntington's express satisfaction, SBAM cured any such technical default within its rights under Section 11.1(b) of the CLA prior to the issuance of the Huntington Notice.  (See Complaint Exhibit F, ECF No. 1-7, PAGEID.217.)

51.     As set forth in the SBAM Notice, Defendants asserted that Huntington was in breach of the CLA for these reasons, among others:

(i)  by expressly notifying the Borrower of its refusal to fund the Loan;

(ii)  by accelerating the principal balance of the Loan;

(iii) by freezing the Borrower's deposit accounts;

(iv) by threatening the Guarantors;

(v)  by charging the "Default Rate" of interest on the Loan; and

(vi) by and through other actions and statements which rendered Borrower's full or partial performance under the Loan actually or practically impossible at this time. **Exhibit 1, p.2**.

37

52.     Furthermore, as SBAM referenced in the SBAM Notice, Huntington had completely ignored Section 3.1(s) of the CLA, which controls the Project timing with a construction schedule.  That section requires that the Borrower deliver to the Lender "on or before the second Disbursement of Loan Proceeds a schedule ("Construction Schedule") which among other things set forth dates for commencement and completion of the Project. (**Exhibit 1**).

53.     Since the Disbursement of Loan Proceeds had not yet occurred, the Borrower was not yet obligated to provide the Construction Schedule which would set the commencement date for the Project.

54.     Accordingly, section 3.1(s) of the CLA recognizes that the "Construction" process is fluid and may not fully "commence" (within the Lender and Borrower's mutual and/or divergent contemplation of the meaning of those terms) within a strict 60 days after the Loan Closing Date.

55.     Section 3.1(s) of the CLA contemplates a later date when the second Disbursement of Loan Proceeds is made.

56.     Section 3.1(s) it therefore is wholly inconsistent with the allegations of default in the Huntington Notice.

57.     The reason that Huntington set forth in the Notice for its declaration of default and made in support of its decision to halt funding on the CLA is merely a bad faith pretext.

1807584

58.     Huntington had been well aware of the progress of the Project and had never provided notice to SBAM prior to the Huntington Notice that it had any concerns with the progress of the Project, construction or otherwise, and no financial defaults of any nature are alleged to have occurred.

59.     Moreover, as of December 22, 2022, the date of the Huntington Notice and the date that Huntington stopped funding the loan, there was ample time for SBAM to have completed the Project by the Final Construction Completion Date of November 9, 2024, or later as set forth at Section 3.1(s) of the CLA, and Huntington's denial of SBAM's cure rights under Section 11.1(b) of the CLA is in violation of the CLA.

60.     Through its unjustified contractual and financial squeeze out of SBAM, described above and through the Huntington Notice, Huntington expressly breached the CLA and the implied covenant and duty of good faith and fair dealing in the performance of its contractual obligations at issue in this matter.  Huntington has in bad faith attempted to destroy SBAM's right to receive the benefits of the parties' agreements.

61.     Tellingly, Huntington waited almost a year (340 days) after providing the Huntington Notice before filing this action on November 27, 2023.

1807584

## COUNT I –BREACH OF CONTRACT

62.    SBAM incorporates by reference each of the foregoing allegations contained in this Complaint.

63.    SBAM and Huntington had a contract under which Huntington was to loan to SBAM up to $23,429,000.00 in exchange for SBAM fulfilling its obligations to Huntington under the contract.

64.    SBAM has fulfilled all of its obligations to Huntington under the contract.

65.    Huntington breached the contract between the parties when among other things it, without justification or providing SBAM with an opportunity to cure under Section 11.1(b) of the CLA:  a) declared that SBAM was in default; b) refused to fund the CLA loan amount; c) accelerated the principal balance of the loan and demanded immediate repayment of the amount loaned; d) froze SBAM's deposit account; and e) began charging the default rate of interest.

66.    SBAM was unable to continue construction activities following Huntington's refusal to fund the loan amount.

67.    Huntington's declared reasons for the default were a mere pretext. The true reason is that Huntington was not satisfied with how unrelated loans (Sheridan and Wellesley) were progressing, and Huntington wanted to squeeze SBAM and exit its contractual obligations to SBAM without justification.

68.     In addition to its express breach of the CLA, Huntington has also breached the implied covenant of good faith and fair dealing relative to its own performance, obligations and discretion under the CLA.  Huntington has in bad faith attempted to destroy SBAM's right to receive the benefits of the parties' agreements.

69.     Since the date of Huntington's breach, financial and economic market conditions for the Project have substantially worsened (for example, rising interest rates, decreasing property values to support appraisals and other local and national economic factors), rendering impossible SBAM's ability to mitigate its losses caused by Huntington through alternative financing.

70.     As a result of Huntington's breach of contract, SBAM has suffered and will continue to suffer damages to be proven at trial, including the total loss of and insolvency of the Project and the total loss of the Equity and the Projected Profit.

## **REQUEST FOR RELIEF**

Counter-Plaintiff SBAM Park Avenue, LLC requests the Court to enter a judgment against Counter-Defendant The Huntington National Bank in an amount that exceeds $75,000.00 plus costs, interest, and all recoverable fees and expenses.

1807584

WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.

*/s/Wayne Walker*

By:   Richard E. Rassel, III (P57540)
       Wayne Walker (P51290)
       Attorney for SBAM Park Avenue, LLC
       380 N. Old Woodward Ave., Ste. 300
       Birmingham, MI  48009
       (248) 642-0333

Dated:  January 10, 2024

1807584