# EXHIBIT 1

SBAM Notice



Williams Williams Rattner & Plunkett, P.C.
Attorneys and Counselors

380 North Old Woodward Avenue
Suite 300
Birmingham, Michigan 48009

Tel: (248) 642-0333
Fax: (248) 642-0856
www.wwrplaw.com

Richard E. Rassel, III
rer@wwrplaw.com

February 28, 2023

**Via FedEx Only**
The Huntington National Bank
2301 W. Big Beaver Road
Troy, Michigan 48084
Attn: Adam Luderer

**Via FedEx Only**
Bodman PLC
6th Floor at Ford Field
1901 St. Antoine St.
Detroit, Michigan 48226
Attn: Brian P. Foley, Esq.

**Via FedEx & Email to ejbeh@aloia.law**
Joseph N. Ejbeh, Esq. Aloia Law
48 S. Main Street, Suite 3
Mount Clemens, Michigan 48043

      Re:    **The Huntington National Bank Construction Loan to SBAM Park Avenue, L.L.C.**

              **Response to Notice of Default dated December 22, 2022 from Joseph N. Ejbeh, Esq.**

              **Notice of actual and anticipatory Default to The Huntington National Bank**

Gentlemen:

      Please be advised that this law firm represents SBAM Park Avenue, L.L.C. ("**Borrower**"), John R. Gibbs, Diego Reyes, Gabriel P. Weinart, Michael Ouaknine, and the Michael Ouaknine Living Trust Dated August 27, 2019 (collectively, the "**Guarantors**") with respect to the construction loan ("**Loan**") evidenced by the Construction and Term Loan Agreement with The Huntington National Bank ("**Lender**") dated May 9, 2022 ("**Loan Agreement**") and all other loan documents referenced therein ("**Loan Documents**").

01678864.DOCX



The Hunting National Bank
Bodman PLC
Joseph N. Ejbeh, Esq.
February 28, 2023
Page 2

This communication is a Notice under Section 14.5 of the Loan Agreement.

Our clients are in receipt of that certain letter entitled "Notice of Default of Construction Loan" dated December 22, 2022 from Joseph N. Ejbeh, Esq. ("**Default Notice**"), but deny that any "Default" by the Borrower or the Guarantors exists under the provisions of the Loan Documents. We further dispute the allegations set forth in the Default Notice that the Loan is in Default. To the contrary: (i) by expressly notifying the Borrower of its refusal to fund the Loan[1]; (ii) by accelerating the principal balance of the Loan; (iii) by freezing the Borrower's deposit accounts; (iv) by threatening the Guarantors; (v) by charging the "Default Rate" of interest on the Loan; and (vi) by and through other actions and statements, the Lender is breaching, or unequivocally declaring its intent not to perform its own obligations under the Loan Documents, as detailed below, rendering Borrower's full or partial performance under the Loan actually or practically impossible at this time.

The Default Notice erroneously alleges a technical default by the Borrower under the Loan Agreement at Section 6.1 for failing to timely "commence construction" of the Project (as undefined in the Loan Agreement) and to continue construction until completion. We concur that Section 1 of the Loan Agreement defines the "Construction Commencement Date" as the date construction of the Project commences, and that such commencement shall occur within 60 days after the Loan Closing Date of May 9, 2022. However, the Loan Agreement fails to define the terms and activities "commence construction" and/or "construction". The Default Notice attempts to define these terms and activities in a very narrow manner, a definition that disregards the activities of the Borrower to date and which are part of an ordinary course and industry standard "construction" process.

The Loan Agreement was drafted by the Lender, and any ambiguities such as the meaning of "commence construction" and/or "construction" must therefore be strictly construed against the Lender. The Borrower has engaged in various construction activities for the Project of which Lender is fully aware, several of which occurred prior to the Construction Commencement Date, including but not limited to: (i) the payment of municipal fees; (ii) obtaining a demolition permit; (iii) performing demolition and site safety work activities; (iv) completing architectural and engineering work with Kraemer Design Group and others at the expense of hundreds of thousands of dollars of Borrower's investor equity; (v) engaging Monahan Construction as the Project general contractor; (vi) pursuing and investing in obtaining certain historic tax credits for the Project; (vii) building infrastructure and mounting signage assets on the building; (viii) and performing certain other abatement and demolition preparation

---

[1] See Section 2.1 of the Loan Agreement: "Borrower agrees to borrow from Lender, *and Lender agrees to lend to Borrower*, an amount not to exceed the Loan Amount". (Emphasis added).

01678864.DOCX



The Hunting National Bank
Bodman PLC
Joseph N. Ejbeh, Esq.
February 28, 2023
Page 3

work on the Project. The Borrower has continuously advised the Lender's loan officer of the progress of its construction activities and critically, the Lender's loan officer has continuously advised the Borrower that its activities above constituted the *timely commencement of construction* (meaning "commence construction" under Section 6.1). While not all of the foregoing activities occurred by the Construction Commencement Date, they occurred prior to the issuance of the Default Notice. Therefore, by engaging in these construction activities, and advising the Lender and its representative of the occurrence of such construction activities, to the Lender's express satisfaction, the Borrower cured any such technical default prior to the Default Notice.

Further, the Default Notice completely ignores Section 3.1(s) of the Loan Agreement, which controls the Project timing with a construction schedule. This Section requires that the Borrower deliver to the Lender "On or before the second Disbursement of Loan Proceeds, a schedule ("Construction Schedule") which, among other things, sets forth dates for commencement and completion of the Project. . . ." Since the Disbursement of Loan Proceeds has not yet occurred, the Borrower is not yet obligated to provide the Construction Schedule which sets the commencement date for the Project. As a result, Section 3.1(s) recognizes that the "construction" process is fluid and may not fully "commence" (within Lender and Borrower's mutual and/or divergent contemplation of the meaning of those terms) within a strict 60 days after the Loan Closing Date. Section 3.1(s) actually contemplates a later date, when the second Disbursement of Loan Proceeds is made. This provision is inconsistent with the Lender's alleged Default of the Borrower as set forth in the Default Notice.

While alleging a tortured technical Default, the Lender makes no claim that the Borrower defaulted on any material terms of the Loan Agreement, such as failing to make payments, or breaching any financial covenants. Even assuming the Lender's claim that the Borrower did not "commence construction" (again, undefined), by the Construction Commencement Date is accurate, there is a substantial amount of time built into the construction timeline for the Borrower to complete the Project. Section 6.1 contemplates that this timeline will be refined when the Construction Schedule is delivered. The "Final Construction Completion Date", which is the date by which the Borrower has achieves "Substantial Completion" of the Project and is entitled to the "Final Construction Disbursement" is not scheduled to occur until 30 months after the Loan Closing Date, pursuant to the definitions of "Final Construction Completion" and "Final Construction Completion Date" in Section 1 of the Loan Agreement. The duration of the construction process was to be 15-16 months, which timing was discussed with the Lender's loan officer prior to the Loan Closing Date to ensure the Project would be completed by the Final Construction Completion Date. The Loan Documents were negotiated with this construction duration in mind. This construction duration shows that with the progress made on the Project



The Hunting National Bank
Bodman PLC
Joseph N. Ejbeh, Esq.
February 28, 2023
Page 4

from the Loan Closing Date to the present time, there is more than ample time for the Borrower to complete construction of the Project by the Final Construction Completion Date.

The Default Notice alleges the Borrower failed to comply with the Project Covenant in Section 6.1, which the Borrower also disputes. As discussed above, the Borrower's construction activities constituted construction of the Project prior to the Construction Commencement Date and/or prior to the issuance of the Default Notice. Further, the objective of Section 6.1 is to ensure that the Borrower will ". . . achieve Substantial Completion on or prior to the Substantial Construction Completion Date and Final Construction prior to the Final Construction Completion Date." Given that the Final Construction Completion Date is 30 months after the Loan Closing Date, the Borrower can certainly meet that date as indicated in the preceding paragraph.

The issuance of the unjustified Default Notice and the subsequent actions of the Lender have damaged the Borrower, for which Lender must be held accountable. As one example, the Borrower has a balance of approximately $600,000 in a deposit account with the Lender, to be utilized on Project expenses. The Borrower recently attempted to make payments from this account, only to learn that the Lender had frozen the funds in such account on February 17, 2023, without providing any notice to the Borrower, making these funds inaccessible to the Borrower. Since the Borrower is not in Default, the Lender had no right to freeze this account[2] and the Borrower has had to inequitably scramble to make alternative arrangements to locate funding sources elsewhere to make certain payments to vendors and third parties.

The Lender has also acted in bad faith and violated the covenant of good faith and fair dealing by actually and/or anticipatorily breaching the Loan Documents when it notified the Borrower that the Lender will no longer honor the terms of the Loan. The Default Notice states on Page 3 that the Lender is "terminating any obligation or responsibility on the part of Lender to make further advances of loan proceeds on the Construction Loan. . . .". On Page 4, the Default Notice states that "the Lender elects to exercise its Default Remedy and therefore there will be no further funding of the Construction Loan." Contrary to this position, the Lender has a specific obligation, pursuant to Section 2.1 of the Loan Agreement, to fund the Loan: ". . . Lender agrees to lend to Borrower, an amount not to exceed the Loan Amount, on the terms of and subject to the conditions of this Agreement." Since the Borrower was not at the time the Default Notice was issued, and is not now, in violation of any of the terms of the Loan Documents, this notice by the Lender constitutes an actual or anticipatory breach of the Loan Documents under Michigan law. The Lender's breach is unjustifiably forcing the Borrower to mitigate its damages

---

[2] See Loan Documents at Section 15(f)(vi) – requiring a proper Event of Default to exercise remedies over Borrower account collateral.

01678864.DOCX



The Hunting National Bank
Bodman PLC
Joseph N. Ejbeh, Esq.
February 28, 2023
Page 5

by refinancing the Loan from another lending source or even selling the Project and the underlying real estate asset. Any such refinancing will require the Borrower to incur additional expenses in the form of commitment fees, appraisal fees and other transactional costs, legal fees, and a higher interest rate in this escalating interest rate environment to refinance the Loan and pay off the Lender as demanded. A sale would be a catastrophe to the Borrower and its investors.

The Lender's misleading and wrongful actions as described above have placed the Borrower and its investors at risk of losing their equity capital *and* the realization of the business profit opportunity the Project represents, based on proforma financial projection data shared in detail with the Lender, which the Lender used to underwrite the Project. Thus, the possible loss of specific equity capital and specific business profit opportunity in the event of a default or breach *by Lender* of *its* obligations and covenants, including but not limited to those at Section 2.1 to fund the Loan in an amount not to exceed the Loan Amount, were fully within the contemplation of the Parties at the time of contracting. The Borrower intends to hold the Lender liable for its damages to the fullest extent allowable under Michigan law based on the issues addressed in this Notice.

Further, based upon information and belief, and specific statements to this effect from the Lender's loan officer to the Borrower, it has also come to our attention that the Lender is attempting to avail itself of an opportunity to use this Loan, and an artificial and pretextual declaration of Default here, to exert business leverage against some of the Guarantors involved in another construction loan transaction with the Lender on unrelated property with disparate ownership in Detroit, Michigan, without a contractual or legal right to do so. If this is true, the Lender is exhibiting bad faith in this respect and is further violating the covenant of good faith and fair dealing by alleging a technical default under the Loan, on an asset that is fully solvent and a Loan that is performing and in balance, to force the desired performance of some of the Guarantors on an unrelated loan transaction. Such unlawful conduct is actionable, and the Borrower will hold the Lender accountable for such bad faith dealing.

Before this dispute regarding between the Lender and the Borrower causes irreparable harm to the Borrower, we would suggest a meeting to discuss the differences between the Parties and determine how the Parties can pursue a course of conduct that leads to a resolution of this dispute and the success of the Project. Please advise.

Borrower and Guarantors reserve all rights.

01678864.DOCX



The Hunting National Bank
Bodman PLC
Joseph N. Ejbeh, Esq.
February 28, 2023
Page 6

Very truly yours,

WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.

*RICHARD E. RASSEL*

RICHARD E. RASSEL

cc: Clients via email
    John D. Gaber, Esq.

01678864.DOCX